ROBERTO COLÓN PADILLA ET UX., Plaintiffs and Petitioners, v. SAN PATRICIO CORPORATION, Defendants and Respondents.

No. 11233. Submitted May 2, 1955.*—Decided April 14, 1959.

* Re-Submitted: January 30, 1958.

*Toro & Malley* for petitioners. *Fiddler, González & Nido* and *Carlos J. Faure; Milton F. Rúa; Miranda Esteve & Martínez Álvarez, Jr.*, and *A. Miranda Cárdenas; Otero Suro & Otero Suro* for respondents.

MR. JUSTICE SALDAÑA delivered the opinion of the Court.

Roberto Colón Padilla and Ana María Roméu de Colón filed in the Superior Court, Bayamón Part, a complaint entitled "Modification of Restrictions" against San Patricio Corporation, the Registrar of Property of Bayamón, and others. They alleged, briefly, that on December 14, 1942, they acquired by purchase from H. L. Sewall a certain property having an approximate area of 100.25 cuerdas; that it was the remainder of another property having a larger area, from which 76 and odd cuerdas had been previously segregated and sold to San Patricio Corporation; that the deed of sale to that corporation contains a series of "restrictions and limitations" imposed "for the purposes of setting up a uniform plan of improvements for the benefit of the present

and future purchasers of the property hereby sold, or any part of the principal property which may hereafter be divided for residential purposes"; that according to the terms of that deed, such restrictions "shall encumber all the land involved in this sale and any part of the principal property from which it is segregated and which may hereafter be subdivided for residential purposes," wherefore they actually constitute an encumbrance both on the property sold to San Patricio Corporation and on the remainder of the principal property which the plaintiffs acquired thereafter; that one of those restrictions prohibits the subdivision of any of the properties, for residential purposes, *"into parcels of less than one acre,"* and another provides that no structure may be erected *"at a distance of less than 50 feet from the front of the lot or parcel and at no less than 25 feet from the lateral borders of the lot or parcel";* and that in effect the former District Court of Bayamón rendered judgment on August 16, 1951, holding that the property belonging to the plaintiffs is encumbered by and subject to each one of the said restrictions.

Invoking "the equity jurisdiction [of the] court, inasmuch as the restrictions . . . constitute equitable servitudes, a subject which is regulated by principles of equity" the plaintiffs also prayed for the cancellation, modification, or alteration of said restrictions for the purpose of permitting the construction on their property of an urbanization having lots of 1,000 meters (instead of one acre), which are not subject to the limitations relative to front and lateral yards. In support thereof, they alleged the following grounds which it is imperative to copy herein verbatim:

"A. Restrictions on property are not favored, and the courts should not enforce them if they are against public policy and work real hardship (*Glines* v. *Matta,* 19 P.R.R. 388).

"B. The Planning, Urbanizing, and Zoning Board, an agency created by law for the purpose of regulating the constructions and urbanizations in Puerto Rico, has authorized an urbanization

on the property in question on condition that the area of the lots be 1,000 meters, wherefore the said restrictions are contrary to public policy.

"C. Radical changes have occurred between August 31, 1940, when the said restrictions were adopted, and the present time, in the locality of Urbanización San Patricio and in plantiffs' property as a result of the enlargement of Insular Highway No. 2, the construction of Roosevelt Avenue, and the development of Caparra, Caparra Terrace, Caparra Heights, Puerto Nuevo, and Park Side Developments, some of which adjoin San Patricio .Development and plaintiffs' property.

"D. The limits of the city of San Juan have been extended as far as the borders of the property belonging to plaintiffs.

"E. As a result of the foregoing changes in the locality, the value of the plaintiffs' property has increased to such an extent, for all purposes, including property taxes, that it would be unfair and iniquitous to devote it at present, from necessity, to agricultural purposes.

"F. The plaintiffs are prevented from urbanizing their property for the purpose of selling lots of not less than *one acre,* inasmuch as the cost of urbanizing is at present $3 per square meter as compared with $0.30 in 1940, when the restrictions herein involved were adopted, so that the cost of urbanizing would be about $12,000 per lot, to which sum it would be necessary to add the cost of the property and other expenses, such as fees, commissions, reserve for payment of income taxes, and a certain percentage for profits. From the foregoing it follows that the selling price per lot of not less than one acre would run into about $18,000, and there is no market in the locality for the sale of lots for the price of $18,000 per lot.

"G. As a result of the radical changes in that locality and the general development of the city of San Juan and its outskirts, the aims and purposes of those restrictions have been completely and permanently subverted.

"H. As a result also of the radical changes in that locality, the enforcement of those restrictions would not result in substantial benefit to any party who may so request.

"I. Equitable servitudes being perpetual, their continuation in perpetuity would work great hardship to the plaintiffs as a result of the changes in the locality, wherefore such restrictions would result in serious injustice to the plaintiffs.

"J. The construction of a first-class urbanization under the regulations and requirements of the Planning, Urbanizing, and Zoning Board, on the basis of lots of 1,000 meters, does not affect at present the aims and purposes of such restrictions."

At the instance of the defendants, who in their answer or by motion alleged that the complaint "did not state facts constituting a cause of action," and without holding a hearing to consider the case on the merits, the Superior Court rendered final judgment in the action dismissing the complaint and ordering the plaintiffs to pay the sum of $500 for attorney's fees. In support of its ruling, the Superior Court stated as follows:

"The complaint in this case is entitled Modification of Restrictions. It is sought thereby to change the terms of a contract embodied in a public deed, which were consented to by the plaintiff himself.

"This Part of the Superior Court refused at some prior time to comply with plaintiff's present request. We refer to the judgment we rendered on August 16, 1951, which is final because Roberto Colón did not appeal in civil case No. R–4321, Roberto Colón v. Frank Ramírez de Arellano, for Declaratory Judgment.

"In this litigation the plaintiff invokes the principle of equity relying, evidently, on § 7 of the Civil Code, 1911 ed. The juridical acts which create rights and obligations have the name, meaning, and scope placed upon them by the law, properly weighed, and not those which the parties may wish to ascribe. Contracts have as much force as the law itself as respects the parties thereto.

"In the present case, Roberto Colón bound himself under certain contracts entered by him, and he can not at the present time, invoking equity, release himself from such obligations. It is not fair for the parties to deny rights already recognized. "*Pacta sunt servanda*" is a rule of law which establishes that strict compliance be had with an agreement entered into, and that the parties are bound to keep and comply faithfully with the terms stipulated by them. The contract is law for the contracting parties, and it is a well-established rule that contracts can not be rescinded by the will of only one of the parties, and

that no one may rescind his own acts. No matter how one binds himself he remains bound, and the manner in which a servitude is created can not be altered at the will of one of the parties.

"We believe that the defendants are right in alleging that the complaint does not state facts constituting a cause of action. We also believe that the complaint is not amendable.

"The complaint filed in this case by Roberto Colón Padilla is dismissed, and he is ordered to pay the costs, including the sum of five hundred dollars ($500) for defendant's attorneys."

Reconsideration was sought on the ground that the dismissal of the action, without a hearing, did not lie because the complaint alleged a cause of action which was sufficient at law, and also that evidence was necessary for the decision of the question of res judicata. The lower court, after hearing the parties on the motion for reconsideration, held that the latter was without merit and denied the same. The plaintiffs then appealed. The grounds for review alleged before this Court are as follows:

"First Error: The [Superior] Court erred in holding that the plaintiffs had no cause of action.

"Second Error: The [Superior] Court erred in applying the doctrine of res judicata to the case at bar.

"Third Error: The [Superior] Court erred in dismissing and failing to pass upon the question of law as to the authority of the Planning Board over contractual restrictions.

"Fourth Error: The [Superior] Court erred in imposing attorney's fees in the sum of $500."

I

Obviously, the "restrictions, conditions, and limitations" regarding the use of plaintiffs' property constitute what in our law is termed *"equitable servitudes."* We are dealing in fact with restrictive covenants "for the benefit of present and future acquirers," which impose special charges or liens as part of a general plan of improvements for the development of a residential urbanization on that property and on the tract of land acquired by San Patricio Corpora-

tion. By virtue of those covenants, the parties agreed on certain restrictions as to use which are identical and uniform for both properties. Moreover, the restrictions thus imposed were reasonable, were specifically set forth in the deed, and were recorded in the Registry of Property. We have consistently held that those restrictive covenants are valid and also that they create real charges or liens on real property for the benefit of another.[1] However, in order to determine whether in the case at bar the complaint asserts a claim which warrants the granting of some relief, we must decide two fundamental questions: (1) Does a court in Puerto Rico have power to decree the modification or cancellation of those equitable servitudes whenever radical changes have occurred in the locality of the restricted area?, and (2) is the approval by the Planning Board of the urbanization plans sufficient to render ineffective ipso facto the equitable servitudes, insofar as they prevent the construction of such urbanization?

Within the Civil Code system it is very difficult to use the juridical concept of predial servitudes for the purpose of imposing private restrictions upon lands sought to be urbanized. In fact, if under the label of real burdens it is sought to establish restrictions on the use and size of the lots, on the type and style of the houses or buildings, on the dimensions of the yards, etc., we must assume that the lands of the urbanization were already encumbered by the corresponding and mutual restrictions while they were still in the full dominion of the alienating urbanizer. On the other hand, it is indispensable to establish restrictions whose content be a true positive obligation to do, as principal undertaking and not merely as an accessory undertaking. Thus, for example, it is often necessary to compel the owner of a

---

[1] *Glines* v. *Matta*, 19 P.R.R. 388 (1913); *Lawton* v. *Rodríguez*, 35 P.R.R. 445 (1926); *Macatee* v. *Biascochea*, 37 P.R.R. 1 (1927); *Lawton* v. *Rodríguez*, 38 P.R.R. 34 (1928); *Carrión* v. *Lawton*, 44 P.R.R. 448 (1933); *Fiol* v. *López de la Rosa*, 46 P.R.R. 724 (1934); *Santaella* v. *Purón*, 60 P.R.R. 539 (1942); *Baldrich* v. *Registrar*, 77 P.R.R. 700 (1954); and *Pérez* v. *Pagán*, 79 P.R.R. 185 (1956).

servient tenement in an urbanization to execute positive acts such as the construction of a park, of a school, or of a club for the benefit of the future acquirers of other lots and houses of the urbanization. However, the predial servitude in civil law is never produced if the servient tenement belongs to the owner of the dominant tenement, since in such case the rule *nemini res sua servit* controls. In other words, the real servitude provided in the Civil Code is conceived only as a limited real right *in another's property*. And it is also well known that real servitudes which require an obligation to do, except in an accessory way—*servitus in faciendo consistere nequit*— are not permitted in civil law.

The practical needs created by recent urbanization developments have given rise to severe criticism of the rules of *"nemini res sua servit"* and *"servitus in faciendo consistere nequit"* in many civil-law countries such as Germany, Belgium, and Switzerland. See Schmidt-Rimpler, *La servidumbre a favor del Propietario, Revista Crítica de Derecho Inmobiliario* 14, 93, 178, 321 (1931). Enneccerus, Kipp & Wolff admit that "there are many reasons in favor of the necessity of the owner's servitude," precisely in the case of urbanization burdens. IV–2 *Tratado de Derecho Civil* 40–41 (2d ed., Span. tr. 1951). *Cf.* II Hedemann, *Tratado de Derecho Civil* 350–51 (Span. tr. 1955). The Belgian doctrine and case law have also struggled against the existing juridical obstacles to create truly positive servitudes and to impose urbanization burdens on a single tenement. De Page says that the practical interests require that such urbanization burdens constitute servitudes of a real character, and analyzes the means employed for eluding in practice the inflexibility of the law. He concludes that: "The rule *servitus in faciendo consistere nequit . . .* is staggering at present. The day will perhaps come when it will be admitted that a servitude consists in doing something positive, provided it involves an act of public interest. It would not be the first time that the individualistic principles of the Roman

legislation would have to give into the law of the future."
VI. *Traité Ellementaire du Droit Civil Belge* 402–05, 406–
08, 501–75 (1953). *Cf.* 3 Planiol y Ripert, *Traité Pratique
de Droit Civil Francais* 866–79, 916–84 (2d ed. 1952). And
the Civil Code of Switzerland in its § 733 authorizes every
owner to establish a servitude on a tenement belonging to him
in favor of other real property also belonging to him. The
"Statement of Motives" contains the following justification:
"This institution may be very useful. It is enough to think
about the construction of a whole urbanization on certain
property which originally belonged to a single owner. The
latter may create from the beginning, on all the lots to be
sold thereafter, appropriate servitudes for the entire urban-
ization project." Rossel, *Code Civil Suisse* 249 (7th 1948).
See, also, Tuor, *Le Code Civil Suisse* 534–35 (2d French ed.
1950). *Cf.* Osorio Morales, *Las Servidumbres "in faciendo"
en Derecho Español*, 21 *Rev. Derecho Privado* 177 (1934).

It is nothing unusual, therefore, that since 1913,
when the case of *Glines* v. *Matta*, 19 P.R.R. 388, was de-
cided, the jurisprudential doctrine in Puerto Rico has in-
corporated in our law what is known as "equitable servi-
tude." The incorporation or adoption of that institution was
made through the writ of injunction authorized by the Act
of March 8, 1906. See 32 L.P.R.A. § § 3521–33. There-
fore, although injunction is in principle a procedural means
to enforce judicial determinations, in matters involving real
urbanization charges it serves as a basis for the rules of a
substantive character existing in our law. Thus, it is shown
that nowadays the substantive right still flows from and is
developed through the interestices of the procedure. Hence,
in Puerto Rico the restrictions on property right imposed
on lands sought to be urbanized are not considered as predial
servitudes, subject to the provisions of the Civil Code relative
to the latter. They are servitudes which are regulated by
the equity principles of the Anglo-American law, provided
the latter are not in conflict with the existing laws in our

country. Consequence: through an equitable servitude the owner of certain property sought to be urbanized may himself impose a burden on his own tenement, and may also establish a real charge imposing an obligation to do as principal undertaking. Likewise, the owner of an equitable lien has no right to a confessory real action for the purpose of asserting his rights, nor to a possessory action when his possession is disturbed. Injunction relief undoubtedly lies to compel the owner of the servient tenement to comply with the obligation imposed by the equitable servitude. However, the difference is obvious. The respondent in the action of injunction may allege all the defenses allowed to him by the equity principles. For example, laches, estoppel, acquiescence, unclean hands, etc., may be invoked as defenses.

There is no question that this is the well-established rule of this Court. In *Glines* v. *Matta, supra,* the building association imposed upon the Miramar property in Santurce the following restrictions: (1) that the purchaser of a lot "should submit, and be bound . . . for the responsibility of construction and the making of streets, sidewalks, sewerage and piping in proportion to the cost of same, and such works might be undertaken by the company whenever the purchasers of the lots situated in the same street requested it, or before such requests if the company deemed it expedient"; and (2) that "no building, structure, balcony, bay window or other construction, except steps and staircases, shall be erected on these lots at a distance of less than three meters from the front of said lots on the streets on which it is situated." The company inserted these restrictions in a deed and "recorded the latter in the registry of property, and as each lot came to be recorded in the registry a reference was made to such agreement [imposing the restrictions] as emanating from and imposed by the said company." In affirming the judgment granting the petition for injunction to compel the purchasers of a certain lot in Miramar to comply with the second restriction, we held that the plain-

tiffs, as owners of other lots in the same urbanization, were exercising a real right, and that that right arose from the restrictive covenants of the deed which created "equitable servitudes." We stated that ". . . the courts of Porto Rico do not have a general equity jurisdiction . . . but they have by the Injunction Law jurisdiction to prevent the violation of rights. In adopting the Law of Injunction the Legislature necessarily adopted at least a limited part of the law in regard thereto which is in force in the United States." (At 394.) In that case we also recognized to the respondent, in the action of injunction brought for the purpose of enforcing the equitable lien, the right to invoke the defenses of laches, estoppel, and unclean hands, although on the basis of the evidence offered we concluded that they were without merit.

Several years later, in *Lawton v. Rodríguez*, 35 P.R.R. 445 (1926), we considered the validity of a restriction imposed in an urbanization plan upon twelve lots on both sides of a street, in the sense that "the purchaser, his heirs and successors, bind themselves that in case they should decide to build on the lot they will construct only one house, which shall be at a distance of twenty-five feet from the front of the street. . . ." We held that the same was valid because the restrictive covenants have legal effect *"whenever they are reasonable and, when they follow a general plan of improvements, are stated expressly in the title and are recorded in the registry of property."* (At 451–52.) Although we said in passing that the restrictions imposed by reason of sanitary requirements and of embellishment or beautifying purposes come within the concept of positive and negative servitudes defined by the Civil Code, our decision was finally based on the equity principles invoked in the *Glines* case. Moreover, we stated that urbanization restrictions must be uniform and that, "in harmony with our Injunctions Act and the doctrine laid down in the *Glines* case . . . the mere fact that a contract is violated is sufficient ground for the intervention

of the courts by injunction" additional evidence on damages being unnecessary. (At 458-59.) In *Macatee* v. *Biascochea*, 37 P.R.R. 1 (1927), again we applied the equity doctrine as respects another of the restrictions imposed upon the lots of Miramar urbanization, which provided as follows: "These lots shall not be used for mercantile or industrial establishments, but strictly for the erection of dwelling houses." We considered and rejected, on the basis of the evidence presented, the defenses of law alleged by the defendant, to wit: (1) laches, (2) estoppel, and (3) the restriction as to the use "is of no force and effect by reason of the changes that had occurred in the locality near houses [owned by the parties]." Regarding the latter defense, we stated clearly that it should be dismissed because the defendant "has not shown that the changed conditions that may have taken place in Miramar owing to the use made of those buildings have been of such a nature as to invalidate substantially the restrictive covenant as regards the dominant residential part. At least the facts of the present case do not lead us to that conclusion." (At 10.) Thus, it was admitted that a radical change in the neighborhood within the restricted area can terminate the restriction as to use.

The doctrine that radical changes in the neighborhood may constitute a defense in equity or terminate the restriction was also adopted by this Supreme Court in the case of *Carrión* v. *Lawton*, 44 P.R.R. 448 (1933). It should be pointed out first of all that in that case Carrión brought an action to set aside, by court order, the restriction which had already been declared valid in *Lawton* v. *Rodríguez, supra.* It was alleged that the restriction in question should be avoided because, owing to the changed conditions, it had no practical effect at all. We rejected that contention in the following language: "The conditions existing in the urbanization when the original action was brought are practically the same as those which existed when the present action was brought.

Carrión admits that there has been no change in Carrion's Court for more than five years. This was said by him in March, 1931. It is evident that the defendant Rodríguez Rivera had an opportunity to plead any alteration or change that might constitute a good defense. *It has not been proved that changes have occurred between then and now to justify the remedy sought by the plaintiff.* We hold that Carrión is estopped from setting up this defense which was not presented by his predecessor in interest when he was sued six years prior to the institution of the present action. It has not been shown that the trial court was influenced by passion, prejudice, or partiality. *It is well to say that according to the evidence introduced, no houses have been built on lots marked Nos. 1, 2 and 6. Nine houses have been built on on the remainder of the property, without including that of Carrión on lot No. 4 which the courts have ordered to be demolished. A house and part of another appear to have been built on lot No. 5 and the same is the case regarding lot No. 12. One house has been built on each of the other lots, exclusive of that of Carrión, the destruction of which has been ordered.* Carrión testified that all of these houses were built prior to the sale from Joy to Rodríguez, with the exception of one built by Ana A. Márquez on lot No. 5." (At 464.) (Italics ours.) It is evident that in that judgment this Court for the second time admitted that certain changes in the neighborhood may bring about the extinguishment or modification of the equitable servitudes. That is why it was necessary to examine the evidence and then conclude that no changes have occurred "between then and now to justify the remedy sought by the plaintiff." [2]

However, the contraposition between equitable and predial servitude established in the judgment rendered by this Court in *Fiol* v. *López de la Rosa*, 46 P.R.R. 724 (1934), is

---

[2] In the same connection, see *Lawton* v. *Rodríguez*, 38 P.R.R. 34, 38 (1928).

even clearer and more conclusive. There the plaintiff sought to evade the equitable defense of laches by filing an action for the specific performance of the restrictive covenant instead of resorting to injunctive relief. However, in the opinion delivered by Mr. Justice Córdova Dávila, this Court ruled that that did not alter the nature of a cause of action because *"the performance of a restrictive covenant is demanded, and it is precisely such restrictions which, in accordance with the American cases, are governed by the principles of equity."* (At 730.) It is clear, therefore, that such urbanization restrictions can never be characterized as predial servitudes, even though the procedure of injunctive relief is circumvented. For the same reason, in considering the defense of laches, we dismissed the contention that that equitable defense was not applicable because the restriction as to use imposed upon the Miramar lots indeed constituted a negative predial servitude, laying down once and for all the following doctrine: "We believe that something resembling a servitude is indeed involved, but the truth is that this something, while deeply rooted in historical law, appeared for the first time in all of its integrity, and as presented in this case, upon the introduction in this island of the so-called subdivisions (*urbanizaciones*), wherein large and small parcels of land are used, in whole or in part, for building-sites, streets, sidewalks, sewerage, water, and lighting systems, according to rules previously established. Such rules should therefore be interpreted in accordance with the principles of law in the light of which they have been construed in the states of their origin, provided, of course, these principles are not in conflict with the laws in force in Puerto Rico. In the very cases cited by the appellant [Glines and Lawton], the court said, in the first case through Mr. Justice Wolf, that something *equivalent to an encumbrance or a servitude* was involved, and in the second case through Mr. Justice Franco, that there was involved something which *partook in*

*its essence of the nature of certain servitudes*, but in the decision of both cases principles of equity were applied, in accordance with the decisions of American courts on the point." (At 729.)

That doctrine was reaffirmed in *Santaella* v. *Purón*, 60 P.R.R. 539 (1942). In that case we applied the principles of equity for the purpose of determining the rights which arose from a restriction as to use upon the Miramar lots. The defenses of laches and estoppel were rejected on the basis of the evidence. Moreover, considering the restriction as an equitable servitude, it was held that proof of actual or substantial injury is not essential, the establishment of a violation of the restriction being all that is necessary to justify an injunction. We reached identical conclusions in *Pérez* v. *Pagán*, 79 P.R.R. 185 (1956).

We need only add, before closing this analysis of our case law, that by analogy with the civil-law predial servitude we used the terms "servient tenements" and "dominant tenements" in *Baldrich* v. *Registrar*, 77 P.R.R. 700 (1954), in holding that equitable servitudes create real rights which are recordable in the Registry of Property. That is why the cancellation of their mention or record can not be made in the Registry of an *ex parte* petition without the express consent of the persons prejudiced by such cancellation. Hence, it can not be inferred that urbanization restrictions create actual predial servitudes. In accordance with the provisions of art. 2 of the Mortgage Law (30 L.P.R.A. § 2) and art. 27 of the Mortgage Law Regulations (30 L.P.R.A. § 858), all real property rights shall be recorded and they are not limited to those defined in the Civil Code. In other words, in our positive law prevails the theory of *numerus apertus*, which admits the possibility of creating real rights other than those provided and organized by the Civil Code. It is for the authorities and the doctrine to determine the real nature of the different subjective rights, according to the economic con-

veniences of the contracting parties." [3] Since the equitable servitude ordinarily has the character and effects of a real right, for the purposes of the Registry there is no objection to considering it as a variance or modality of the servitudes expressly regulated by the Civil Code. That is why the right of equitable servitude is recordable, notwithstanding the fact that the juridical concept has been wedged into our case law. Precisely, in the *Baldrich* case the owner of certain lands sought to be urbanized had imposed himself a burden on a tenement belonging to him. The registration could not be justified because an orthodox predial servitude had been constituted. *Cf.* 15 *Rev. Jur. U.P.R.* 195, 200–01 (1955).

▮ It therefore appears that the provisions of the Civil Code do not determine when the modification and extinguishment of equitable servitudes will take place. We have already held that the creation, the content, and the scope of these real urbanization burdens are governed by the principles developed and applied by the law of equity. Logically, it is necessary to complete the incorporation of this juridical concept in our law. If we apply to it the modes of extinguish-

---

[3] As stated by Puig Brutau, "it is not the same thing to determine whether it is possible to create a real right, other than those regulated by the Code, as to know whether this creation, if in the affirmative, is without limits." 3 *Fundamentos de Derecho Civil* 32 (1953). There is a number of real rights expressly recognized by law. But there are other unnamed ones which the authorities and the doctrine accept when they can be assimilated, or are variances of the juridical concepts admitted by the civil precepts. *Ibid.* 31–35; 2 Roca Sastre, *Derecho Hipotecario* 188–92 (5th ed.); 2 Castán, *Derecho Civil Español, Común y Foral* 7–29 (6th ed.); III–1 Puig Peña, *Tratado de Derecho Civil Español* 10–21 (1951); 2 Borrell y Soler, *Derecho Civil Español* 427–32 (1955); and Lacruz Berdejo, *Lecciones de Derecho Inmobiliario Registral* 110–20 (2d ed. 1957). However, we are not deciding *a priori* that all rights known as equitable servitudes have the character and the effects of a real right, for the purposes of the Registry. It all depends on the nature of the specific right concerned. But there is no reason for limiting with excessive strictness the category of the real rights, without practical reasons therefor, as is apparently the tendency of the Spanish doctrine which is inspired on abstract theories derived from German authors.

ment and modification of the civil-law predial servitudes, the institution would be mutilated, truncated, and incomplete. Moreover, in view of the rapid growth and changes in our urban centers, a juridical rule which would permit the eradication of obsolete private restrictions is indispensable. The equity doctrine relating to the extinguishment by radical changes in the locality fully meets this need. Yet, none of the modes of extinguishment and modification of the predial servitudes in our civil law protects adequately that public interest. As stated by Puig Brutau, "The maximum expression of the principle that the servitudes must be exercised *civiliter* would be a rule to read like this: the servitude shall be extinguished when the tenements reach such a condition *as to render unnecessary* the use of the servitude in the future." 3 *Fundamentos de Derecho Civil* 425 (1953). But the rule proposed is not included in § 482 of our Civil Code, although it applied in the particular case of the servitude of enclosed tenement. Section 504 of the Civil Code, 31 L.P.R.A. § 1735.

According to the principles of equity, the private restrictions which constitute equitable servitudes are modified or extinguished in the following cases: (1) by agreement of the interested parties, either by total or partial rescission of the restrictive covenants or by the imposition of new restrictions altering the original ones; (2) by the lapse of time or upon performance of the condition if the restrictions have been imposed for a term or conditionally; (3) by the merger of unity of ownership of all the so-called "servient" and "dominant" tenements in a single person; (4) by the waiver or abandonment by the owners who receive the benefits of the servitude upon existence of conduct showing a conclusive intent to relinquish or abandon the benefits; (5) by condemnation of the servient tenement if the equitable servitudes are inconsistent with the type of use to which the government will put the condemned real property; and (6) when radical changes in the locality not only render the restriction

unreasonable and oppressive for the owner of the servient tenement, but also render the restriction valueless to the owner of the dominant tenement, as a result of which the purpose intended by the servitude is defeated.[4] It is this last ground for modification or extinguishment which we wish to distinguish within strict bounds in the case at bar.

But before attempting to do so it is necessary that we clarify two points. The first is this: in addition to those cases in which the servitude is modified or extinguished, the law of equity recognizes as personal defenses several motives and circumstances respecting "the personal equities between the parties." We already mentioned the defense of unclean hands—where the plaintiff has repeatedly violated the restrictions which he seeks to enforce by injunction. We also pointed out other defenses such as acquiescence—where the plaintiff has acquiesced in the violation of restrictions by third parties, provided such violations are of a substantial and permanent nature; laches, estoppel, etc. None of these defenses affect the rights of the owners of other dominant lots who are not guilty of carelessness, fault, or negligence. Moreover, they do not bar a claim for damages for the violation of a restriction, even though it is determined that they justify the denial of the injunctive relief to enforce the equitable servitude. See Casner and others, *op. cit. supra*, § 9.38. The second point which calls for clarification is that the radical changes in the character of the neighbor-

---

[4] See 5 Restatement, Property, § 528 *et seq.* (1944); 2 Casner and others, American Law of Property, § § 9.24–9.90 (1952); Chafee, Simpson, and Maloney, Cases on Equity 416–95 (3d ed. 1951); McClintock, Handbook of the Principles of Equity 336–53 (2d ed. 1948); 4 Pomeroy, Equity Jurisprudence 846–56 (5th ed. 1941); Williams, Restrictions on the Use of Land: *Equitable Servitudes*, 28 Tex. L. Rev. 194 (1949); notes in 4 A.L.R. 2d 1111, 88 A.L.R. 405, and 54 A.L.R. 812. Compare the modes of extinguishment and modification of the orthodox predial servitudes in our civil law: 2 Castán, *Derecho Civil Español, Común y Foral* 562–65 (9th ed. 1957); 3 Puig Brutau, *Fundamentos de Derecho Civil* 406–12 (1953); and III–I Puig Peña, *Tratado de Derecho Civil Español* 393–414 (1951).

hood may constitute a defense, if it is invoked in an injunction suit brought by the owner of the dominant tenement, as well as a basis for an action at the instance of the owner of the servient tenement seeking a judicial declaration that the equitable servitude has been modified or extinguished. Obviously, it would be irrational to compel the owner of the servient tenement to violate the restrictions in order that he may test the enforceability of his rights and determine whether, notwithstanding the changes in the locality, the courts would enforce by injunction the restrictions imposed by an equitable servitude. And there is no reason at law for doing so, for since 1931 there is a statute in Puerto Rico authorizing declaratory judgments in a very liberal manner. Act No. 47 of April 25, 1931 (Sess. Laws, p. 378); 32 L.P.R.A. § § 2991–3006. Cf. *Moscoso* v. *Rivera*, 76 P.R.R. 450 (1954); *Llópiz* v. *Arburúa*, 72 P.R.R. 496 (1951); and *Gual* v. *Pérez*, 72 P.R.R. 569 (1951). Declaratory relief will lie provided there is a real and actual controversy between the parties and that it is possible to dispel any doubts and uncertainties respecting the rights of the latter, by means of a judgment settling such controversy. The purpose of a declaratory judgment is precisely to obviate the insecurity and hazards of a "leap in the dark" when there is a genuine juridical controversy between the parties. It is well to say that the latter are not bound to act without knowing beforehand their rights and obligations. Furthermore, it should be borne in mind that in those states where the Uniform Declaratory Judgment Law is in force, which is identical with the Puerto Rico statute since 1931, the decisions of the courts admit that a declaratory judgment will lie for the purpose of ascertaining the effect of radical changes in the locality upon equitable mutual restrictions. Such judicial decree—it must be stressed—may be affirmative or negative as to its form and effects. But it always has the effect and force of a final judgment on the rights of the parties who

own servient or dominant tenements in the restricted area. See *Marra* v. *Aetna Construction Co.*, 101 P.2d 490 (Cal. 1940) ; *Hess* v. *Country Club Park*, 2 P.2d 782 (Cal. 1931) ; *Lacov* v. *Ocean Ave. Building Corp.*, 178 N.E. 559 (N.Y. 1931) ; *McArthur* v. *Hood Rubber Co.*, 109 N.E. 162 (Mass. 1915) ; *Needle* v. *Clifton Realty Corp.*, 73 A.2d 895 (Md. 1950) ; Borchard, Declaratory Judgments (2d ed. 1941) 375, 946–50 ; 2 Anderson, Actions for Declaratory Judgments (2d ed. 1951) 1339–44 ; note, Developments in the Law-Declaratory Judgments 1941–49, 62 Harv. L. Rev. 787 (1949). Thus, according to our Uniform Declaratory Judgment Law, the owner of a tenement which carries the burden of an equitable restriction is entitled to an affirmative relief if the locality has undergone radical changes: judicial modification or extinguishment of such restrictions. *Cf. Carrión* v. *Lawton*, 44 P.R.R. 448 (1933), and *Lawton* v. *Rodríguez*, 38 P.R.R. 34 (1928). See Casner and others, *op. cit. supra* § 9.39 ; Simpson, *Fifty Years of American Equity*, 50 Harv. L. Rev. 171, 216–17 (1936) ; and note in 4 A.L.R. 2d 1111, 1117–38 (1949).

▮▮▮▮▮▮ Now then, with these preliminary considerations in mind we ask, which are and what constitute the changes in the locality for determining whether an equitable servitude should be extinguished or modified? It is necessary that they be of a radical and permanent nature and preclude the attainment in a substantial degree of the advantages and benefits established in favor of the dominant tenements. In other words, if by reason of the radical and permanent changes in the conditions of the locality it is practically impossible to carry out or accomplish the aims sought by the equitable servitude, then the servitude is modified or extinguished. It should be noted that in such case the changes should: (1) render the restriction unreasonable and oppressive for the owner of the servient tenement; (2) destroy the value which the restriction would otherwise have for the owners

of the dominant tenements, and (3) frustrate completely and permanently the purpose or object of the restriction. It is necessary that these three requirements be present in order to justify the termination of the restriction. Furthermore, the changes in the locality must affect in the manner stated all the lots comprised within the restricted area. It is not sufficient that a part of such area, situated on the border of or alongside the district which is not subject to restrictions, should suffer the impact of such changes if there are lots or interior portions of the restricted area which can still receive the advantages and benefits established in their favor by the equitable servitude. That is to say, the restrictions can not be extinguished by a gradual process of abrogation which commences with the lots situated on the border of the restricted area and extends step by step to the portions or lots situated in the center of the restricted lands. And a mere change in the economic conditions of the surrounding area, which affects the market value of the property, does not by itself produce the extinguishment or modification of the equitable restrictions.[5] It is clear that both the changes within the restricted area and the alterations on the surrounding lands may be taken into consideration. However, when the changes in the locality are due to violations of the restrictions in the area subject to the equitable servitudes, the case is rather one of abandonment or waiver of such restrictions.[6]

---

[5] *Jackson* v. *Stevenson*, 31 N.E. 691 (Mass. 1892); *Dolan* v. *Brown*, 170 N.E. 425 (Ill. 1930); *Hunter* v. *Wood*, 120 Atl. 781 (Pa. 1923); *Ockenga* v. *Alken*, 41 N.E.2d 548 (Ill. 1942); *Marra* v. *Aetna Construction Co.*, 101 P.2d 490 (Cal. 1940); 4 A.L.R. 2d 1111 (1949), and cases therein cited; 2 Casner and others, *op. cit. supra* § 9.39; and 5 Restatement of Property, § 564 (1944).

[6] It is well to stop and make at this point a triple admonition. In the first place, the statements in this opinion apply only to equitable servitudes, that is, to private restrictions which constitute real urbanization charges, and do not refer in the least to orthodox predial servitudes of our civil law. In the second place, it is also clear that the dualism between "equity" and "law" which characterizes the Anglo-American law does not exist in Puerto Rico. Only principles of equity may be invoked

 We therefore see with indisputable clarity that the lower court committed an error of law in dismissing the action on the ground that the complaint did not state a valid claim. In fact, considering all the averments of the plaintiffs, the granting of a relief evidently could be warranted in conformity with the legal principles which govern equitable servitudes. With words which, because of their constant use have already become a theme song, we repeat that "a complaint should not be dismissed for insufficiency unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim," and that "in weighing the validity of a motion to dismiss [a complaint] for insufficiency, the duty of the court is not to test the final merit of the claim in order to determine which party is to prevail. Its duty, rather, is to consider whether in the light most favorable to the plaintiff,

---

in connection with specific institutions which have been incorporated in our law by legislation or by jurisprudential doctrine as of the texts of certain laws, such as that of trusts, of injunctions, etc. *Cf. People v. Escambrón Beach Club,* 63 P.R.R. 731 (1944); *Belaval v. Court of Eminent Domain,* 71 P.R.R. 246 (1950); *Álvarez v. Secretary of the Treasury,* 80 P.R.R. 15 (1957); *Rossy v. Superior Court,* 80 P.R.R. 705 (1958). See Gutteridge, Comparative Law 96–100 (2d ed. 1949); Rabasa, *El Derecho Angloamericano* 136–458 (1944); Friedmann, Legal Theory 379–82 (3d ed. 1953); Castán, *La Formulación Judicial del Derecho— Jurisprudencia y Arbitrio de Equidad* (2d ed. 1954); Jolowicz, Roman Foundations of Modern Law 54–60 (1957); David, *Introduction a L'etude du Droit Privé de L'Anglleterre* 172–99 (1948); 2 Arminjon, Nolde and Wolff, *Traité de Droit Comparé* 510–29 (1950); Puig Brutau, *Estudios de Derecho Comparado* 97–136 (1951); *Id., La Jurisprudencia como Fuente del Derecho* (undated). In the third place, when we speak of "extinguishment or modification" by radical changes in the character of the locality the term "modification" refers only to the cancellation or extinguishment of one or several restrictions within all or a series of restrictions related among themselves. The sole function of the Court is to determine which restrictions have been extinguished. It is not for the Court to remake the contract between the parties: for example, reducing the minimum area of the lots from one acre to one thousand meters. If the private restriction as to the minimum size of the lots has been extinguished, then only the limitation which the Planning Board may impose will prevail. But it is obviuos that such restriction could have been extinguished, even though the others subsist.. This last case would be one of "modification" of the equitable restrictions.

and with every intendment regarded in his favor, the complaint is sufficient to constitute a valid claim." *Boulón* v. *Pérez*, 70 P.R.R. 941, 946 (1950); *González* v. *Hawayek*, 71 P.R.R. 493, 498 (1950); and *Cruz* v. *Ortiz*, 74 P.R.R. 298, 301 (1953). Summing up, we hold that the complaint in this case states a cause of action according to the existing legal doctrine regarding the changes in the locality which bring about the extinguishment or modification of an equitable servitude. We do not pretend, however, to prejudge in any manner the result of the litigation. Our only holding is that the complaint, as a matter of law, states a valid claim.

## II

■ We now turn to examine the second question we posed before determining whether the complaint stated a cause of action: Is the approval by the Planning Board of the urbanization plans sufficient to render ineffective ipso facto the equitable servitudes, insofar as they prevent the construction of such urbanization? In our opinion, the answer is clear. The fact that the Planning Board has approved the construction of the urbanization referred to in the complaint does not have the effect of invalidating the private restrictions which may prevent its construction. As stated in *Pérez* v. *Pagán*, 79 P.R.R. 185, 187–88: ". . . There is nothing in the Planning Act, 23 L.P.R.A. §§ 1–54, nor in the Regulations approved by the Board by virtue of that Act, indicating that the mere issuance of a building permit has the effect and scope of invalidating private restrictive covenants which are inconsistent with the permit granted. The issuance of a building permit is a mere ministerial duty where the application strictly complies with the existing laws and regulations concerning buildings. Yokley, Zoning Law and Practice, vol. 1, 2d ed. § 99, p. 234. *Cf. Deliz* v. *Board of Building Appeals*, 71 P.R.R. 128, 131. The situation is analogous to that arising when a zoning regulation permits

in a district a use which is prohibited by restrictive covenants. The case law is abundant to the effect that in such cases the restrictions prevail." The zoning regulations and the approval of the plans of the urbanization in question *permit* but do not require that the property of the plaintiffs be devoted to *more ample* uses than those provided by the private restrictions. In this case there is no direct conflict between both types of limitations, for the latter are obviously of a negative character. By the same token, if the zoning regulations were more strict than the private restrictions of a negative character, neither would there be direct conflict between both types of limitations: those private restrictions authorize but do not require that the property be devoted to the uses prohibited by the zoning regulations. A conflict would exist only if the private restrictions would limit the property to certain uses which are expressly prohibited by a zoning regulation or by a ruling of the Planning Board. See 2 Metzenbau, The Law of Zoning 1108–12 (2d ed. 1955) ; 2 Rathkopf, The Law of Zoning and Planning 387–92 (3d ed. 1956) ; *Burgess* v. *Magarian,* 243 N.W. 356 (Iowa 1932) ; *Wilkman* v. *Banks,* 269 P.2d 33 (Cal. 1954) ; *Equitable Restrictions and Government Regulation of Private Land Use,* 10 Syracuse L. Rev. 78 (1958) ; Van Hecke, *Zoning Ordinances and Restrictions in Deeds,* 37 Yale L. J. 407 (1928) ; 2 Casner and others, *op. cit. supra.* § 9.40, and 4 A.L.R. 2d 1111 (1949). It is to be noted that art. 16 of the former Planning Regulations provided that "Whenever the provisions of this Regulation conflict with the clauses or limitations in private agreements or contracts relative to zoning matters, the most restrictive shall govern." Planning Regulation No. 4 (1946), p. 19. This article was repealed in 1951. Since then the zoning regulations contain no provision on this matter. See New Planning Regulation No. 4 (1955.)

Applying these principles, we might say, without fear of making a mistake, that the approval of the plans for the urbanization in question is not sufficient to render ineffective ipso facto the private restrictions which limit the use of plaintiffs' property. However, it is well to point out that the zoning regulations and the approval by the Board of the plans for the urbanization are facts which the lower court should take into consideration, together with the other evidence which may be introduced at the trial for the purpose of determining whether the private restrictions have been extinguished as a result of the radical changes in the neighborhood. Chafee, Simpson, and Maloney, *op. cit. supra* at 495; Simpson, *Fifty Years of American Equity*, 50 Harv. L. Rev. 171, 218; note in 29 Mich. L. Rev. 112 (1930). When fixing the use zones and the requirements for the granting of building or urbanization permits, the Planning Board is bound to consider the characteristics of the locality and the total area of the zoning district. Its conclusions on this point are not final when it is sought to determine whether, as a result of the radical changes in the neighborhood, a private restriction has been extinguished or modified. Nor can the courts ignore those administrative determinations which reflect the general interest of the community. *Cf. López* v. *Planning Board*, 80 P.R.R. 625, 640 (1958).

## III

 The lower court also based its judgment on the doctrine of res judicata. It stated expressly that: "This Part of the Superior Court refused at some prior time to comply with plaintiff's present request. We refer to the judgment we rendered on August 16, 1951, which is final because Roberto Colón did not appeal in civil case No. R-4321, *Roberto Colón* v. *Frank Ramírez de Arellano*, for Declaratory Judgment." That pronouncement of the lower court was based exclusively on the pleadings. Neither the previous judgment nor the record of Case No. R-4321 was presented

in evidence. Furthermore, no evidence on this matter was ever heard before the trial court. Neither did the defendants offer affidavits, depositions, or admissions for the purpose of raising the question of res judicata under Rule 12(*b*)(6) or under Rule 56. *Cf. Ramos* v. *People*, 67 P.R.R. 600 (1947); *Bithorn* v. *Santana*, 68 P.R.R. 281 (1948); *Sánchez* v. *De Choudens*, 76 P.R.R. 1 (1954); *Iturriaga* v. *Fernández*, 78 P.R.R. 29 (1955); *Sierra, Sec. of Labor* v. *Bird*, 78 P.R.R. 161 (1955); *Rossy* v. *Superior Court*, 80 P.R.R. 705 (1958); and 2 Moore, Federal Practice §§ 12.07–12.10. In their answer, they merely alleged as special defense that: "The issue raised by the complaint has already been definitively decided against the plaintiffs' claims by the judgments rendered by this Court on March 12, 1945, in cases Nos. R-442 and R-541, Injunction, and by the judgment rendered by this Court on August 16, 1951, in case No. R-4321, Declaratory Judgment, which three judgments have become final and unappealable and have the character of res judicata between the parties, both as to the controversies and rights therein adjudicated and those which could and should have been raised in the respective actions which gave rise thereto." We believe that the lower court could not pass upon the question of res judicata thus raised without considering the evidence which both parties might offer at the corresponding trial.

From the face of the complaint it does not appear conclusively that the judgment in the former suit No. R-4321 was res judicata between the parties on the issues raised in the case at bar. In the third paragraph of the complaint reference was made to the former suit, stating only the following: "For the purpose of determining the interpretation and scope of the afore-mentioned sixth clause (as well as other clauses of the deed which are not pertinent here) relative to the ownership thereof, coplaintiff Roberto Colón Padilla filed in the former District Court of Bayamón a

petition for declaratory judgment, entitled *Roberto Colón* v. *Ramírez de Arellano et al.*, Civil No. 4321, in which judgment was entered on August 16, 1951, holding that the property owned by the plaintiffs was encumbered by and subject to all the restrictions set forth in the preceding sixth clause." In accordance with the allegations contained in the said paragraph of the complaint, it is impossible to determine whether there is complete identity between the parties and the causes of action in both suits, which is necessary for the purposes of res judicata. According to the well-established rule of this Court, applying the provisions of § 1204 of the Civil Code (1930 ed.), 31 L.P.R.A. § 3343, " . . . to successfully invoke the defense of res judicata, the most perfect identity must exist between the subject matter, the causes of action, the parties, and the capacity in which they acted, and the former judgment, by its own nature or by legal provision, must constitute an adjudication on the merits." *Muñoz* v. *Pardo*, 68 P.R.R. 569, 572 (1948); *Silva* v. *John Doe*, 75 P.R.R. 198, 202 (1953); *Camacho* v. *Catholic Church*, 72 P.R.R. 322, 340 (1951); *Araújo* v. *Arenas*, 60 P.R.R. 277, 289 (1942); *Balasquide* v. *Luján*, 46 P.R.R. 548, 554–57 (1933). The test for determining whether the same parties and the same cause of action are involved is the facts of both actions and not the manner in which the petitions are entitled. *Dávila* v. *P. R. Ry. Light & P. Co.*, 44 P.R.R. 923, 933–36 (1933).

There is no question that, according to the doctrine of res judicata, a litigant can not split a cause of action. Hence, the same parties and the same cause of action being involved, a judgment is res judicata as to all the claims which could have been litigated and adjudicated in a suit. See *Miller* v. *Cía. Ron Carioca Destilería, Inc.*, 71 P.R.R. 662 (1950); *Avellanet* v. *Porto Rican Express Co.*, 64 P.R.R. 660 (1945); *People* v. *Lugo*, 64 P.R.R. 529 (1945); *Heirs of Rivera* v. *Lugo*, 63 P.R.R. 13 (1944); and *Laloma* v. *Fer-*

*nández*, 61 P.R.R. 550 (1943). However, the effect of a declaratory judgment with respect to subsequent controversies between the parties, by way of bar or merger, depends on the scope of the declaration of rights made in the declaratory judgment. A declaratory judgment is not final as to matters or facts which could have been adjudicated but which were not in fact the subject of a declaration in the said judgment. *Blanco* v. *The Capital*, 77 P.R.R. 607, 612 (1954). See, also, Restatement, Judgments § 77 (1942); 10 A.L.R.2d 782 (1950); *Developments in the Law—Declaratory Judgments*, 62 Harv. L. Rev. 787, 840-44 (1949); *Developments in the Law—Res Judicata*, 65 Harv. L. Rev. 818, 881-82 (1952). In other words, the declaratory judgment entered in the former suit (even if there be identity between the parties) would be res judicata only if the questions raised in the case at bar were actually raised in that case and were truly or necessarily litigated and adjudicated. That is why the applicability of res judicata can not be decided either for or against the plaintiffs on the basis of the pleadings. Both parties should have an opportunity to show and establish at the corresponding trial which were the questions and the rights actually adjudicated in the action for declaratory judgment No. R-4321.[7]

 The theory that on the ground of the judicial notice the lower court could apply the doctrine of res judicata in the case at bar, seems untenable. In the first place, for the purpose of settling a controversy as to the question

---

[7] It should be noted that the doctrine of res judicata as respects declaratory judgments operates in a manner analogous to the doctrine of collateral estoppel, in ordinary cases. Under the doctrine of collateral estoppel, the former judgment is final if the matters involved in a subsequent action even if another cause of action is involved, were actually litigated and adjudicated between the same parties. *Tartak* v. *District Court*, 74 P.R.R. 805, 814 (1953); *Long Corporation* v. *District Court*, 72 P.R.R. 737, 739 (1951); Restatement, Judgments §§ 68-72 (1942); Scott, *Collateral Estoppel by Judgment*, 56 Harv. L. Rev. 1 (1942); and Polasky, *Collateral Estoppel—Effects of Prior Litigation*, 39 Iowa L. Rev. 217 (1954).

of res judicata raised in a suit, a court can not take judicial notice of the proceedings had and the judgment entered in another cause of action prosecuted in that court. This is the rule which has always prevailed in Puerto Rico according to the provisions of § 36 of the Law of Evidence—§ 398 of the Code of Civil Procedure, 32 L.P.R.A. § 1711. See *Vargas* v. *Inter. Gen. Electric Co. of P. R.*, 60 P.R.R. 501, 507 (1942); *Figueroa* v. *Alonso*, 57 P.R.R. 487 (1940); *Aponte & Sobrino* v. *Heirs of Pérez*, 48 P.R.R. 437 (1935); *Dávila* v. *P. R. Ry. Light & P. Co.*, 44 P.R.R. 923 (1933). *Cf.* 96 A.L.R. 944 (1935); 30A Am. Jur. *Judgments* §§ 437–473; 20 Am. Jur. *Evidence* §§ 86–88. On the other hand, even assuming that judicial notice could be taken of the facts appearing in the record of case R-4321—because they can be the object of accurate and immediate showing by resorting to sources of easy access and indisputable preciseness—the court was bound to give the parties a reasonable opportunity to submit information as to whether it should take judicial notice of that matter and its content. This is necessary to duly protect the court against surprise and uncertainty. Obviously, the lower court in the case at bar did not comply with those procedural requirements.[8]

---

[8] See Morgan, Some Problems of Proof Under the Anglo-American System of Litigation 36–69 (1956); 1 Morgan, Basic Problems of Evidence 9–15 (1954); McCormick, Handbook of the Law of Evidence 687–712 (1954); 9 Wigmore, Evidence (3d ed. 1940) §§ 2568–68a. Rules 801–06 of the Rules of Evidence for the General Court of Justice, adopted by this Supreme Court and transmitted to the Legislative Assembly, alter the existing rule in Puerto Rico: they would permit a court to take judicial notice of the judgment and of the proceedings in another litigation for the purpose of passing upon a question of res judicata. In fact, what appears from a judicial record "is specific facts which may be the subject of an immediate and accurate showing by resorting to sources of easy access and indisputable accuracy." But an appropriate procedure is also provided in Rules 803 and 804 to protect the parties' interests. Rule 803 provides: "The judge shall take judicial notice of all the matters specified in Rule 802 if a party so requests and furnishes sufficient information to the judge which will enable him to adequately grant the request, and, furthermore, if it has given to each adverse party such notice as the judge may deem necessary to enable him to comply with

In view of the foregoing, the judgment appealed from will be reversed and the case remanded to the lower court for further proceedings not inconsistent with this opinion.

Mr. Chief Justice Negrón Fernández, although not present at the time of signing this judgment, participated in the consideration of the case and agrees with the opinion of the Court.

Mr. Justice Belaval dissented.

the request." Rule 804(1) requires that: "The judge shall inform the parties as to the content of any matter with respect to which he proposes to take judicial notice, and shall give them a reasonable opportunity to submit information as to whether judicial notice should be taken of such matter and its content." The said Rules of Evidence were first adopted on January 13, 1958, and were transmitted to the Legislative Assembly on February 5, 1958. They were readopted on January 9, 1959 and transmitted to our Legislative Assembly on January 16, 1959.